# UNITED STATES DISTRICT COURT
## for the
### Central District of California

| | |
|---|---|
| United States of America<br>v.<br>ABEL VAIKAU<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 2:25-MJ-07207-DUTY<br>)<br>)<br>)<br>) |

LODGED
CLERK, U.S. DISTRICT COURT
11/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: KM  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
11/18/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: jm  DEPUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __November 16, 2025__ in the county of __Los Angeles__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Section 841(a)(1), (b)(1)(A)(viii) | Possession with Intent to Distribute (Methamphetamine) |

This criminal complaint is based on these facts:
Please see attached affidavit.

☐ Continued on the attached sheet.

/s/Jeffrey Welch
*Complainant's signature*

Jeffrey Welch, Special Agent (HSI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/18/2025 AT 12:43 P.M.

*Judge's signature*

City and state: Los Angeles, California        Hon. Michael Kaufman
*Printed name and title*

*AUSA:* Rahul R.A. Hari (x6159)

## **AFFIDAVIT**

I, Jeffrey Welch, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against, and arrest warrant for, Abel VAIKAU ("VAIKAU") for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (possession with intent to distribute methamphetamine).

2.  This affidavit is also made in support of an application for a search warrant to search the following digital device (the "SUBJECT DEVICE"), seized during the arrest of VAIKAU on November 16, 2025, and held in the custody of Homeland Security Investigations ("HSI"), in El Segundo, California, as described more fully in **Attachment A**:

   a.  One white Apple iPhone with pink case found on VAIKAU's person at the time of his arrest.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Possession with Intent to Distribute Controlled Substances) (the "Subject Offense"), as described more fully in **Attachment B**.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and databases.  This affidavit is intended to show that there is

sufficient probable cause for the requested complaint and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   BACKGROUND OF AFFIANT

5.   I am a Special Agent with the HSI, where I have worked since March of 2025. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

6.   During my tenure as a Special Agent, I have completed approximately six months of instruction at the Federal Law Enforcement Training Center ("FLETC"), in Glynco, Georgia, completing the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training. While at FLETC, I received instruction on investigating and identifying crimes, specifically crimes involving drug trafficking, customs laws, and gangs.

7.   I earned my Bachelor of Science degree in Biomedical Sciences in May 2023 from Texas A&M University.

## III.   SUMMARY OF PROBABLE CAUSE

8.   On November 16, 2025, Abel VAIKAU attempted to travel from Los Angeles International Airport ("LAX") to Papeete, Tahiti on Air France Flight AF 4081.

9

9. LAX Customs and Border Protection ("CBP") Officers conducted an inspection of VAIKAU's checked luggage and identified two vacuum sealed bags with a white crystalline substance that field-tested positive for methamphetamine. The suspected methamphetamine weighs approximately 1.80 kilograms.

### IV. STATEMENT OF PROBABLE CAUSE

10. Based on my involvement in this investigation, my conversations with other law enforcement officials involved in this investigation, and my review of reports and records connected to this investigation, I am aware of the following:

11. On November 15, 2025, the Anti-Narcotics Unit in French Polynesia emailed HSI notifying the agency that a suspected methamphetamine trafficker would be travelling outbound from LAX to Papeete, Tahiti on Air France Flight AF 26. The email identified VAIKAU by name as the suspected trafficker.

12. On November 15, 2025, VAIKAU was scheduled to fly from LAX to Papeete, Tahiti on Air France Flight AF 26 at approximately 11:50 p.m. Flight AF 26 was cancelled and rescheduled for the next day after being struck by lightning on the tarmac. The flight was rescheduled for November 16, 2025 at 7:30 p.m. with a new assigned flight number AF 4081.

13. On November 16, 2025, CBP contacted Air France to prepare VAIKAU's luggage for inspection upon VAIKAU's check-in.

14. Air France contacted CBP Officer Alexis Guevera and advised that VAIKAU had checked in with one bag, described as an orange duffel bag and a purple backpack tied together and marked with a single bag tag (Tag No. 0057AF 661313).

15. CBP Officers Maldonado and Urbiztondo responded to the Air France office to examine the baggage. On examining the baggage, Officers Maldonado and Urbiztondo discovered a clear plastic bag containing a white crystalline substance and immediately contacted CBP Supervisor Jensen to relay the findings. The baggage was secured and transported to CBP Supervisor Jensen.

16. VAIKAU was intercepted by CBP Officers Guevara, Raget, and Tionko at gate 202 as he attempted to board his flight. VAIKAU presented officers with his French passport (Passport No. 20AH16210) and stated he was traveling home after a one-week vacation in Los Angeles. Officers conducted an immediate pat-down and VAIKAU was handcuffed and transported to baggage secondary inspection at the Tom Bradley International Terminal for a progressive examination.

17. VAIKAU admitted that the tied-together duffel bag and backpack was his baggage and provided a matching bag tag with the same baggage number.

//
//

18. Officers conducted an examination of the baggage and found a clear plastic vacuum sealed bag containing a white crystalline substance that appeared to be methamphetamine.



19. Officers found a second clear plastic vacuum sealed bag containing a white crystalline substance that appeared to be methamphetamine within the lining of a black bag that was found inside the orange duffel bag.



20. Officers also found a white Apple iPhone with a pink case on defendant's person in his pants' pocket (SUBJECT DEVICE).

21. Officer Guevara conducted a field test of the white crystalline substance found in the vacuum sealed bags, witnessed by Officer Tionko, using a Mistral Group164 test kit.  The field

test yielded positive results for methamphetamine.  In total, the substance  weighs approximately 1.80 kilograms.

22. At approximately 8:15 p.m., HSI Special Agent Karen Gaspar and I conducted an interview of VAIKAU with the help of a French language interpreter.  After reading VAIKAU his Miranda rights, VAIKAU requested an attorney.  The interview was terminated and VAIKAU was placed under arrest.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

23. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

24. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher- level suppliers, as well as associates, to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

25. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices.

26. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text

13

messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

27. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

28. Drug traffickers often maintain large amounts of United States currency to maintain and finance their ongoing drug trafficking businesses or as payment for their roles in ongoing drug trafficking, which operates on a cash basis. Traffickers will often take pictures on their digital devices of this cash to send to co-conspirators as proof of their ability to pay or to boast about sales.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

29. As used herein, the term "digital device" includes the SUBJECT DEVICE.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

15

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    31.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300KB) Word documents, or 614 photos with an average size of 1.5MB.

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. CONCLUSION

33. For all the reasons described above, I respectfully submit that there is probable cause to believe that VAIKAU has committed a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (Possession with Intent to Distribute Methamphetamine).

34. There is also probable cause to believe that the items to be seized, described more fully **Attachment B,** will be found in a search of the SUBJECT DEVICE, described more fully in **Attachment A**.

/s/
Jeffrey Welch, Special Agent, HSI

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 18th day of
November 2025.

HON. MICHAEL B. KAUFMAN
UNITED STATES MAGISTRATE JUDGE